By an agreement bearing date the 14th of September 1832, John S. Preston Co. leased to Overly Sanders *Page 123 
their salt works and salt manufactory in the county of Smyth, reserving a rent of two thirds of all the salt to be manufactured at the works. All the houses, furnaces, kettles and implements necessary to the manufacture of salt, were included in the lease; Overly Sanders stipulating to return them at the end of the lease in the same condition they then were, except the necessary wear and decay of the houses. It was stipulated by the lessors that the salt water should continue as good as it then was, and be of sufficient quantity to manufacture one hundred thousand bushels perannum; or that the lease should be void upon the lessees giving six months notice thereof. The lessees bound themselves to manufacture at least sixty thousand bushels of merchantable salt per annum, so that the rent should be for each year not less than forty thousand bushels; and the portion of salt accruing to the lessors as rent was to be considered as delivered to them when measured to them at the salt house. And the lessees further bound themselves not to lease, assign, or in any manner dispose of their lease, but with the consent in writing of the lessors. The lease was to continue in force for a number of years from the 1st of the next October.
It was further agreed that Preston Co. should lease to Overly Sanders their salt works plantation, with its appurtenances, mills, plaister banks, c. on the consideration that Overly Sanders should sell and dispose of the salt accruing to Preston Co. for the rent reserved as aforesaid, and collect and pay over the same to Preston Co. as rapidly as collections could be made. And it was agreed that all salt sold or disposed of was to be considered as sold or disposed of two thirds for the lessors and one third for the lessees; and was to be so accounted for by Overly Sanders. The account of the salt manufactured was to be kept by a clerk agreed upon by the parties, and whose salary *Page 124 
was to be paid by them according to their respective interest in the salt. And if the lessees became unable or failed to comply with their contract, the lessors were entitled to enter upon and avoid the contract, upon two months notice.
By an agreement bearing date the 1st day of September 1833, between Overly Sanders and A. M'Call and William King, Overly Sanders, reciting their possession of the property mentioned in their agreement with Preston Co., for the consideration thereinafter expressed, relinquished and conveyed to M'Call King all their rights and interest under the lease, in all the premises demised to them by the said lease, in as ample a manner as the same was then enjoyed by them. And they further agreed to deliver to M'Call King, on the next day, along with the leased premises, all their stock of every kind not bought by them originally, including all their purchases of stock, all grain, c., growing or purchased by them from any person whatever, for the purpose of carrying on the salt making business, all goods, wagons, horses or other live stock, or other property purchased with the proceeds of the salt works, and also the proportions of the said Overly Sanders of any salt then on hand at the salt works or elsewhere. And M'Call King bound themselves to assume and pay all the contracts, debts and liabilities relating to the salt making business, not theretofore discharged and performed by Overly Sanders. And they agreed further to pay to Overly Sanders the sum of 7500 dollars in three equal annual instalments from that day, and also twenty-five hundred bushels of salt.
On the 2d of September 1833 an agreement was entered into by William C. Preston, John S. Preston in his own right and as administrator of Charles H. C. Preston deceased, and Thomas L. Preston, with M'Call King, whereby they leased to M'Call King their *Page 125 
salt works in the county of Smyth, with all their appurtenances of lands, mills, plaister banks, houses and plantations adjoining, for and during the life of Mrs. Smith the wife of Francis Smith. And M'Call King bound themselves to pay in consideration of the said lease, on the 1st day of September in each year, the sum of 15,000 dollars per annum for the three first years of the lease, and the sum of 10,000 per annum on the 1st day of September in each year thereafter, during the continuance of the lease. They further agreed to pay to the Prestons thirty-five hundred bushels of salt, to be drawn by them at their pleasure during the first three years of the lease. And it was further agreed between the parties that the lease should continue for the term of Mrs. Smith's life, and one year thereafter, and for ten years longer, if M'Call King should so elect. And they did so elect.
There were some other provisions as to the cutting of wood on the demised premises, and the return of the property on the termination of the lease, which it is not necessary to state.
In 1841 the Prestons instituted a suit in chancery in the Circuit, court of Smyth county against M'Call King, for the purpose of having a settlement of the transactions growing out of the assignment by Overly Sanders of their lease to M'Call King, and also of the rents arising upon the lease by themselves to these parties. In their original and amended bills they state the leases and the assignment by Overly Sanders to M'Call King; and say that the salt works plantation, c., were worth not less than 2000 dollars a year, and were given to Overly Sanders as compensation for selling as the agents of the plaintiffs their proportion of the salt. That Overly Sanders continued in possession of the leased premises for nearly a year, and did not during the time manufacture the sixty thousand bushels of salt as stipulated in their *Page 126 
contract; nor did they pay to the plaintiffs forty thousand bushels, which was the least quantity they were bound to pay to them; nor did they sell for the plaintiffs the quantity they were bound to sell as a minimum of sales for the use of the farms, c., as mentioned in the contract.
They further stated that M'Call King purchased out the lease of Overly Sanders upon an agreement between them and the plaintiffs that the lease was to be annulled and a new lease granted by which the rent was to be paid in money instead of the reservation in kind, and upon the further agreement insisted on by the plaintiffs, that M'Call King should become responsible to them for the fulfilment of all the liabilities which Overly Sanders had incurred to them. That the stipulation in the contract between Overly Sanders and M'Call King, that the latter were to discharge all the liabilities of the former, growing out of the salt making business, was not inserted to secure alone the purchase of the lease, but as the only terms on which the plaintiffs would consent to the sale, and this undertaking by M'Call King in their contract with Overly Sanders was an essential inducement to the plaintiffs to enter into their contract with M'Call . King, and that it was upon these conditions, and these alone, that the plaintiffs would have consented to the sale by Overly Sanders.
They further charge that M'Call King took possession of all the assets of Overly Sanders by virtue of their contract with them, but had failed to account to the plaintiffs for the liabilities Overly Sanders were under to them. That after procrastinating the settlement for many years, M'Call King had at length presented an account which was wholly inadmissible. That at the time of their purchase, M'Call King knew that Overly Sanders were justly indebted to the plaintiffs for 40,000 bushels of salt, and a fair compensation *Page 127 
for the use of the plantation, c., which had been enjoyed by them for executing the agency of selling plaintiffs' salt, and which they knew that Overly Sanders had wholly failed to perform. That in the account rendered by M'Call King, they had failed to give the plaintiffs credit either for the salt due, or for the use of the plantation, which last was worth 2000 dollars. That they had endeavoured to counterbalance the paltry credits allowed to the plaintiffs by charges for horses purchased by Overly Sanders, with which the plaintiffs had no concern. That Overly Sanders had purchased several droves of horses, some of which were on hand when they sold their lease to M'Call King, and were delivered to them with the other property of Overly Sanders, and the attempt seemed to be to make the plaintiffs partners in these purchases with Overly Sanders, and to hold them responsible for two thirds of the losses upon them. And the plaintiffs proceed to point out other errors in the account rendered by M'Call King.
They further charge, that after M'Call King had purchased from Overly Sanders, as before stated, they took possession of all the books, papers, accounts and property belonging to Overly Sanders, and proceeded to settle, assume and pay their debts and liabilities, and to all intents and purposes substituted themselves for Overly Sanders; and the plaintiffs, relying upon their agreement to liquidate their claim upon those parties, never thought of attempting to coerce payment from them; and they had since left the Commonwealth, and, as plaintiffs understood, had become utterly insolvent. That M'Call King had made many payments to the plaintiffs on account of rent, but that the plaintiffs, being either non-residents of Virginia, or having been frequently absent, they had kept no account of the transactions between them and M'Call King, but have been compelled to rely upon *Page 128 
them. That no serious obstacle to a settlement existed with respect to the direct relation of the parties; but the difficulty arising out of the earlier charges in the account of M'Call King against the plaintiffs, had rendered it impossible to ascertain the true balance at any time since its commencement. And they call upon M'Call King to say whether they did not agree to discharge the liabilities of Overly Sanders to the plaintiffs, if the plaintiffs would consent to the sale and make a new lease to them; and that they make a full and fair statement and discovery of all the transactions mentioned in the bill.
The prayer of the bill was for an account, and for a decree for the amount which might be found due thereon; and for general relief.
M'Call King answered the bills. They admitted the execution of the leases referred to by the plaintiffs; but denied the construction put upon them. They concurred with the plaintiffs that there was no difficulty in adjusting the accounts arising out of the lease from the plaintiffs to themselves; but that the difficulties arose out of the contract between the plaintiffs and Overly Sanders, and the claim of the plaintiffs to pass by them and to look directly to the defendants for the fulfilment of the stipulations of that contract, and to hold them responsible for the breach thereof. They insisted that they were only responsible to Overly Sanders under their contract with them, and that they were not responsible to the plaintiffs; and they insisted that these parties were necessary parties in the cause; and that the defendants were entitled to the benefit of all defences they would have against Overly Sanders upon that contract. They denied that the plaintiffs were entitled to be regarded as parties to that contract. They say it is true that this contract and their lease from the plaintiffs, were so far dependent that they would not have made the one without the other; and *Page 129 
that the plaintiffs knew of the negotiation of the contract with Overly Sanders, and were informed of its terms; and to this extent only was there any dependence or connection in the contracts. They insist that if the plaintiffs are entitled to sue upon that contract, which they deny, that they can only be substituted to the rights of Overly . Sanders; and they say that they have already gone far beyond anything which could be properly required of them in the payments which they have made on account of the contracts of Overly Sanders. They deny their liability for the forty thousand bushels of salt as rent for the time Overly Sanders held the property. And they insist that under the contract between the plaintiffs and Overly Sanders, the plaintiffs were liable for the losses upon the horses purchased by them, as they were purchased for salt disposed of by the plaintiffs' agents, and for their mutual benefit. And they insist that they are entitled to charge the plaintiffs with two thirds of the salt so disposed of, which not having been delivered before the defendants came into possession of the works, had been since paid by them; and also for two thirds of the charges of transportation paid by them upon salt transported during the period of the agency of the said firm for the plaintiffs.
In October 1844, an order was made by consent, referring the accounts between the parties to a commissioner; who returned his report in October 1845, with exceptions thereto by both the plaintiffs and defendants; and with special statements made by the direction of M'Call King, presenting their views of the accounts.
In 1845, the plaintiffs, by the direction of the Court, amended their bill, and made Overly Sanders parties defendants in the cause; and one of these defendants answered, and there was an order of publication as to the others. But it does not appear that this amended bill, and the answer thereto, were regularly filed; *Page 130 
though in the final decree, it is said that the cause came on upon the answer and the order of publication.
The cause came on to be finally heard in May 1847, when the death of the defendant King was suggested, and the Court set aside the order of account as having been improvidently made, and dismissed the bill as to the defendant M'Call, with costs. As to the other defendants, the Court expressed his willingness to retain the cause to enable the plaintiffs to proceed against them, but they declining to do so, the bill was also dismissed as to them. From this decree, the Prestons applied to this Court for an appeal, which was allowed.
By the contract of lease between the Prestons and Overly Sanders, the rent thereby reserved of two thirds of the salt to be manufactured by the lessees at the salt works, accrued as the same was made, and in a condition for delivery; but the lessees, in consideration of the lease embracing the salt and plaister plantations, agreed to make sales of the rent salt, with their own, and pay over the due proportions of the lessors as the moneys could be collected. The quantity of the rent salt was therefore dependent upon the amount which should be manufactured. But to insure to the lessees an adequate profit, the lessors contracted that the salt water should continue as good as at the date of the lease, and of sufficient quantity to manufacture 100,000 bushels per annum; and on the other hand, to ensure to the lessors an adequate rent, the lessees contracted to manufacture at least 60,000 bushels of merchantable saltper annum. And in aid of the stipulations of the contract, it was provided, that in the event of a failure as to the quality or quantity of the water, the lessees *Page 131 
might avoid the lease, on giving the lessors six months notice; and that in case of the inability or the failure of the lessees to perform their part of the contract, the lessors, upon giving two months notice, might enter and avoid the lease: these provisions, however, did not exclude the parties from resorting, at their election, to their respective remedies by action or suit for non-performance of the contract. The rent, therefore, to be distrained for, or recovered by the lessors, in any one year, was to be governed by the quantity of salt actually manufactured, and in the event of the failure of the lessees to manufacture 60,000 bushels in such year, the proper action would be for the damages occasioned by, and to the extent of, such failure, and not for a specific rent of 40,000 bushels; the reservation of rent being out of the salt as manufactured; or the proceeds thereof.
The contract of Overly Sanders with M'Call King, operated as an assignment of this lease; and if it had stood alone, the rights of the Prestons to exact performance from M'Call King of the stipulations of the lease, would have been governed by the law regulating the relation of lessors and the assignees of their lessees. But the contract between the Prestons and Overly Sanders expressly provided that the latter should not underlet, or assign, or in any manner dispose of the lease, without the consent in writing of the former; and therefore the lessees could not have parted from their estate to M'Call , King without such consent, which was obtained, and is evidenced by the cotemporaneous contract between the Prestons and M'Call King.
The effect of the last mentioned contract was to terminate the lease so made by the Prestons, and so transferred by the latter to M'Call King, and to create a new lease from the Prestons to M'Call King, for an extended term, and with the reservation of an annual *Page 132 
rent, not in kind, but in money at a fixed amount. The new lease commenced some weeks before the expiration of the first year of the former lease, and operated as a surrender thereof. It extinguished the liabilities of M'Call King as assignees of the first lease prospectively, inasmuch as it was the substitution of another tenancy; and retrospectively there could be no liability on their part as mere assignees for prior breaches of contract on the part of their assignors.
M'Call King, however, by their contract with Overly Sanders, "bound themselves to assume and pay all the contracts, debts and liabilities relating to the salt making business, not theretofore discharged and performed by Overly Sanders." This undertaking obviously embraced the arrears of salt rent then on hand, or which had been transported and sold, and the proceeds unaccounted for by Overly Sanders. Nothing is plainer than that the contracts, debts and liabilities" of the latter, "relating to the salt making business," included the rents of the very property out of which the salt was manufactured. And if M'Call King had merely succeeded to the tenancy of Overly Sanders for the residue of their term, such an undertaking might have embraced the covenant of Overly Sanders to manufacture at least 60,000 bushels of salt per annum. But that covenant assumed the continuance of the tenancy of Overly Sanders, and there could be no breach of it until the end of a year; and such breach was of course rendered impracticable by the surrender of the lease before that time, and the substitution of a new lease thenceforth, with the reservation of a pecuniary rent. The undertaking, therefore, of M'Call King to perform the contracts of Overly Sanders in relation to the salt making business, could not have contemplated a covenant on the part of the latter which had not then been, and never could be broken. *Page 133 
Although the Prestons were not formal parties to the covenant of M'Call King to assume the liabilities which had been incurred by Overly Sanders, yet it was made in part for their benefit, and a consideration therefor moved from them, as well as from Overly Sanders. That consideration consisted of their consent to the assignment to M'Call King, their acceptance from those assignees of the surrender of the old term, and their granting to them a new term of longer duration and upon different reservations. Indeed, the whole change of tenancy was an arrangement in which the Prestons participated, and which could not have been accomplished without their concurrence. They have, therefore, a right, so far as they are concerned, to enforce this undertaking of M'Call King; and the effect of their doing so, is to accomplish its true spirit and meaning so far as concerns Overly Sanders; which was not merely for their indemnity against the debts and contracts contemplated, but for their complete exoneration, by the engagement of M'Call King to relieve them therefrom, and become the debtors and paymasters in their stead.
M'Call King were therefore bound to account with the Prestons for the salt manufactured at the salt works by Overly Sanders, and chargeable with two thirds of the proceeds, after deducting the costs of transportation of so much thereof as was transported and sold by them, and with that proportion of the proceeds of so much thereof as was sold by them at the salt works, and with the same proportion of the value there of so much thereof as there remained unsold.
But inasmuch as the undertaking of M'Call King for the contracts, debts and liabilities of Overly Sanders in relation to the salt making business, extended only to those which had not theretofore been discharged and performed, M'Call King are entitled against the salt rents claimed by the Prestons, to all proper credits *Page 134 
of Overly Sanders at the time of that undertaking, as well for set offs as for actual payments.
There is no foundation, however, for the pretension of M'Call King of a liability to them on the part of the Prestons for debts assumed and paid by them to other creditors of Overly Sanders. If the alleged partnership of the Prestons with Overly Sanders in the sales of salt could give any colour to such a pretension, there was in truth no such partnership. The sales of the rent salt which Overly Sanders contracted to effect as the agents of the Prestons, together with their own, constituted no partnership, but rendered them accountable for the proceeds thereof; and if they chose to contract debts payable in salt for horses or any thing else, the Prestons were in no wise liable therefor; but had a right, notwithstanding, to require payment from Overly Sanders of the proceeds of the actual sales, in money.
The accountability of M'Call King to the Prestons on the head of the salt rents, or the proceeds thereof, assumed for Overly Sanders, was a proper subject for the jurisdiction of a Court of equity, involving, as it did, mutual items of account, growing out of an agency and connected with a trust, and complicated as it was by conflicting pretensions, and requiring a discovery, the production of books and papers, and adjustment by a commissioner. And though in relation to the money rents reserved in the lease to M'Call King, and the numerous payments and set offs connected therewith, there seems to have been no actual dispute between the parties, yet the adjustment of that matter was delayed and prevented by the controversy in regard to the salt rents, without the adjudication of which, the ultimate balance between the parties could not be ascertained. The whole matters of account existing between them, constituted, indeed, but one subject, and grew out of the same transaction — the substitution of M'Call *Page 135 
King as the tenants of the Prestons in the stead of Overly Sanders, their assumption of the salt rents which had theretofore accrued from Overly Sanders, and their engagement for money rents from themselves thereafter. Under the circumstances, and after the whole accounts between the parties had, by a consent order, been referred to a commissioner, and reported by him, with special statements at the request of M'Call King of their pretensions, embracing the money as well as the salt rents, and indicating a balance in their favour upon the whole accounting; the entire merits of the case ought to have been ascertained, and the balance resulting therefrom, whether in favour of the one party or the other, decreed by the Court below.
The cause is however, not in a condition to do justice between the parties without further enquiry. The commissioner has omitted in various respects to state, explain and report the grounds and evidence upon which he proceeded; and the consequence is that his views of the accounts are in a great measure obscure and unintelligible.
The Court is therefore of opinion, that the Circuit court erred in dismissing the bill of the appellants, instead of recommitting the report of the commissioner, with the exceptions thereto, for reconsideration and readjustment of the accounts between the parties, upon the principles above indicated, and such proper evidence as should be adduced before him; with such proper directions from the Court as either of the parties should request, for the examination of other parties on oath, and the discovery and production of books and papers.
It is therefore adjudged, ordered and decreed, that the decree of the Circuit court be reversed and annulled, with costs to the appellants; and that the cause be remanded to the Circuit court, to be proceeded in upon the principles, and in the mode indicated in the foregoing opinion and decree. *Page 136